1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                         CENTRAL DISTRICT OF CALIFORNIA
10
11   SHELENE L. FAULHABER REMICK,    )  Case No. EDCV 09-593 JC
                                     )
12                   Plaintiff,      )
                                     )  MEMORANDUM OPINION
13         v.                        )
                                     )
14                                   )
     MICHAEL J. ASTRUE, Commissioner )
15   of Social Security,             )
                                     )
16                   Defendant.      )
     _____ )
17
18   **I.     SUMMARY**
19         On March 31, 2009, plaintiff Shelene L. Faulhaber Remick ("plaintiff") filed
20   a Complaint seeking review of the Commissioner of Social Security
21   Administration's denial of plaintiff's application for benefits.  The parties have
22   consented to proceed before a United States Magistrate Judge.
23         This matter is before the Court on the parties' cross-motions for summary
24   judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion").  The
25   Court has taken both motions under submission without oral argument.  See Fed.
26   R. Civ. P. 78; L.R. 7-15; April 3, 2009 Case Management Order ¶ 5.
27   ///
28   ///

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED.  The findings of the Administrative Law Judge are supported by substantial evidence and are free from material error.[1]

**II.   BACKGROUND**

**A.   Previously Adjudicated Application**

On August 15, 2002, plaintiff previously filed an application for Supplemental Security Income ("SSI") benefits ("Prior Application"). (Administrative Record ("AR") 70).  An Administrative Law Judge (the "Prior ALJ") examined the medical record and heard testimony from plaintiff, who was represented by counsel, and a vocational expert on April 1, 2004 ("Prior Hearing").  (AR 23-42, 70).

On July 16, 2004, the Prior ALJ issued an unfavorable decision denying benefits based upon the Prior ALJ's conclusion that plaintiff was not disabled at any time through the date of the decision ("Prior Decision").   (AR 70-76). Specifically, the Prior ALJ found:  (1) plaintiff suffered from severe degenerative disc disease of the cervical spine (AR 71); (2) plaintiff's impairment or combination of impairments did not meet or medically equal a listed impairment (AR 71-72); (3) plaintiff retained the residual functional capacity to (a) lift and carry ten pounds frequently and twenty pounds occasionally; and (b) sit, stand, and/or walk six hours (each) in an eight hour workday (AR 74); (4) plaintiff had no past relevant work (AR 74); and (5) plaintiff could perform a full range of light work.

///

///

---

[1]The harmless error rule applies to the review of administrative decisions regarding disability.  See Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004) (applying harmless error standard); see also Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1054-56 (9th Cir. 2006) (discussing contours of application of harmless error standard in social security cases).

**B.    Application in Issue**

On October 7, 2005, plaintiff filed a subsequent application for SSI benefits which is in issue in the instant action ("Application in Issue").  (AR 12, 64-66).  Plaintiff asserted that she became disabled on September 1, 2001 due to spinal disc and nerve muscle damage.  (AR 71, 91.)  The Administrative Law Judge ("ALJ") examined the medical record and heard testimony from plaintiff, who was represented by counsel, and a medical expert on August 13, 2008.  (AR 12-17, 43-63).

On September 18, 2008, the ALJ issued his decision, incorporating by reference and supplementing the Prior Decision.  (AR 12).  The ALJ determined that plaintiff was not disabled since October 7, 2005, the date her SSI application was filed.  (AR 12-17).  Specifically, the ALJ found:  (1) plaintiff suffered from severe degenerative disk disease involving the cervical spine (AR 14); (2) plaintiff's impairment or combination of impairments did not meet or equal a listed impairment (AR 14); (3) plaintiff retained the residual functional capacity to perform a full range of light work as set forth in the Prior Decision (AR 14); (4) plaintiff was unable to perform any past relevant work (AR 16); and (5) there are jobs that exist in significant numbers in the national economy that the plaintiff could perform (AR 16).  (AR 12-17).

The Appeals Council denied plaintiff's application for review.  (AR 4-6).

**III.    APPLICABLE LEGAL STANDARDS**

**A.    Sequential Evaluation Process**

To qualify for disability benefits, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of

3

performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

In assessing whether a claimant is disabled, an ALJ is to follow a five-step sequential evaluation process:

(1)     Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

(2)     Is the claimant's alleged impairment sufficiently severe to limit her ability to work?  If not, the claimant is not disabled.  If so, proceed to step three.

(3)     Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.

(4)     Does the claimant possess the residual functional capacity to perform her past relevant work?[2]  If so, the claimant is not disabled.  If not, proceed to step five.

(5)     Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow her to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

<u>Stout v. Commissioner, Social Security Administration</u>, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  <u>Bustamante v. Massanari</u>, 262

---

[2]Residual functional capacity ("RFC") is "what [one] can still do despite [ones] limitations" and represents an "assessment based upon all of the relevant evidence."  20 C.F.R. § 416.945(a).

4

1    F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679

2    (claimant carries initial burden of proving disability).

3        **B.    Standard of Review**

4            Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of

5    benefits only if it is not supported by substantial evidence or if it is based on legal

6    error.  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir.

7    2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1457

8    (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a reasonable

9    mind might accept as adequate to support a conclusion."  Richardson v. Perales,

10   402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more than a

11   mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882 (citing

12   Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

13           To determine whether substantial evidence supports a finding, a court must

14   "'consider the record as a whole, weighing both evidence that supports and

15   evidence that detracts from the [Commissioner's] conclusion.'"  Aukland v.

16   Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d

17   953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming

18   or reversing the ALJ's conclusion, a court may not substitute its judgment for that

19   of the ALJ.  Robbins, 466 F.3d at 882 (citing Flaten, 44 F.3d at 1457).

20       **C.    Presumption Based Upon Prior Decision**

21           A prior final determination that a claimant is not disabled creates a

22   presumption of continuing non-disability with respect to any subsequent

23   unadjudicated period of alleged disability.  Taylor v. Heckler, 765 F.2d 872, 875

24   (9th Cir. 1985); Lyle v. Secretary, 700 F.2d 566, 568 (9th Cir. 1983).  The

25   claimant can, however, overcome this burden by proving "changed

26   circumstances," such as the existence of an impairment not previously considered,

27   an increase in the severity of an impairment, or a change in the claimant's age

28   category.  See Vasquez v. Astrue, 572 F.3d 586, 597 (9th Cir. 2009) (finding two

changed circumstances – new allegation of mental impairment not raised in prior application or addressed in prior denial and fact that claimant was approaching advanced age); Schneider v. Commissioner, 223 F.3d 968, 973 (9th Cir. 2000) (finding changed circumstances based on worse psychological test scores and diagnosis); Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988) (attainment of advanced age constitutes changed circumstance precluding application of res judicata to first administrate law judge's ultimate finding against disability because advanced age often outcome-determinative under Medical-Vocational grids).

Even when a claimant has demonstrated changed circumstances and thus overcomes the presumption of continuing non-disability, a prior ALJ's findings concerning the claimant's residual functional capacity, education, and work experience or other findings required at a step in the sequential evaluation process for determining disability, are still entitled to some res judicata consideration in subsequent proceedings. Chavez, 844 F.2d at 693.

IV.   **FACTS**

   A.   **Facts and Evidence Presented In Connection with the Prior Application**

At the time plaintiff filed the Prior Application on August 15, 2002, plaintiff was 38 years old, with a high school education and some college education. (AR 27, 71). Plaintiff asserted that she became disabled on June 1, 2002, due to severe scoliosis, a bone spur, pain in the arms and legs, Tourette's Syndrome, and degenerative bone disease of the cervical spine. (AR 71).

July 2002 x-rays revealed mild degenerative changes in the cervical spine. (AR 72, 239). September 2002 x-rays of the lumbar spine and sacroiliac joints were unremarkable. (AR 72). X-rays of the cervical spine revealed a mild marginal spur at C6-7 (otherwise unremarkable). (AR 72, 222). A November ///

2002 MRI revealed degenerative disease of the cervical spine, with no evidence of disc herniation or significant spinal stenosis. (AR 72, 221).

In December 2002, consulting physician Warren David Yu, M.D., examined plaintiff. (AR 72). Plaintiff reported neck pain with intermittent radiculopathy to the right arm, and low back pain with intermittent radiation down her right leg. (AR 72). Doctor Yu noted some paresthesias in the right upper arm, but no sensory deficits, and moderate cervical tenderness with mildly decreased range of motion. (AR 72). Otherwise the examination was essentially normal. (AR 72). Dr. Yu diagnosed cervical and low back pain. (AR 72). As to plaintiff's residual functional capacity, Dr. Yu opined that plaintiff (i) could lift and carry twenty-five pounds frequently and fifty pounds occasionally; (ii) could sit, stand, and/or walk for about six hours (each) of an eight hour workday; and (iii) could use the upper extremities frequently for light pushing, pulling and fine finger movements. (AR 72).

In January 2003, reviewing physician Leonard Naiman, M.D. completed a Residual Physical Functional Capacity Assessment in which he opined that plaintiff (i) could perform medium work with occasional crawling; (ii) could not climb ladders, ropes, and scaffolds; and (iii) could not engage in extreme or constant reaching or stretching that would involve extreme extension of the neck. (AR 72).

In April 2003, Dr. Yu again examined plaintiff. (AR 72). He diagnosed cervical and low back pain with right arm radicular symptoms. (AR 72). As to plaintiff's residual functional capacity, Dr. Yu opined that plaintiff (i) could sit, stand, and/or walk for up to six hours in an eight hour workday; (ii) should only occasionally use the right upper extremity for light pushing, pulling, and fine finger movement and handling; (iii) should have free use of the left upper extremity; and (iv) should be limited on the right to lifting ten pounds occasionally and less than ten pounds frequently. (AR 72).

1   In May 2003, plaintiff reported that she had seen an orthopaedic physician
2   in March 2003, and that the doctor told her that she had degenerative joint disease
3   and that there was nothing he could do.  (AR 72).   She reported increased pain.
4   (AR 73).

5   Also in May 2003, a reviewing physician, Norma Cooley, M.D.,
6   acknowledged Dr, Yu's April 2003 report, but noted that the objective
7   examination of plaintiff was still essentially the same, with subjective weakness
8   and tingling in the right upper extremity.  (AR 73).  Dr. Cooley therefore adopted
9   Dr. Naiman's residual functional capacity assessment reflecting a capacity to do
10   medium work.  (AR 73).

11   An October 2003 MRI of plaintiff's lumbar spine revealed mild
12   degenerative disc disease at L4-5 without significant spinal or neuroforaminal
13   stenosis.  (AR 220).

14   In January 2004, a physician's assistant, Stephen Standley, opined that
15   plaintiff was unable to work until January 2005.  (AR 73).

16   A March 2004 x-ray of plaintiff's cervical spine revealed degenerative
17   changes, most prominent at C6-7, also at C5 with marginal osteophytes, and no
18   evidence of acute fracture or subluxation.  (AR 267).

19   April 2004 treatment notes reflect that plaintiff was advised to discontinue
20   the use of Soma as it was not helping her and as she had not used it for a month.
21   (AR 73).  The doctor recommended physical therapy and an electromyogram of
22   the right upper extremity to rule out right cervical radiculopathy.  (AR 73).
23   Plaintiff subsequently underwent nerve conduction studies and an
24   electromyogram, the results of which were within normal parameters.  (AR 73,
25   278-79).

26   Medical records reflect that plaintiff failed to appear for multiple scheduled
27   appointments with her treating providers at High Desert Community Care Center
28   in 2002 (AR 198) and 2003 (AR 187, 189, 192, 194, 195).

1    At the April 1, 2004 Prior Hearing, plaintiff testified in pertinent part:  She

2    was awaiting surgery on her neck.  (AR 26).  She could not work as a cashier

3    because she could not stand long in one position and would lose feeling in her

4    hands.  (AR 29).  She was currently prevented from working because (1) she could

5    not stand or sit very long, and had to resposition herself because she lost feeling or

6    felt a sharp shooting pain down to her feet; (2) she would lock up or feel paralyzed

7    on her right side if she raised her hand halfway to her head, she could not hold

8    things or grip with her right hand and would get muscle spasms, though she could

9    somewhat grip with her left hand; (3) her neck would get swollen, and on a scale

10   of one to ten, the pain that she felt in her neck was between an eight (on good

11   days) and a ten (on bad days).  (AR 29-30).  Getting up and trying to walk would

12   cause the pain to increase up to a ten.  (AR 30).  Laying on the couch upright and

13   positioning herself correctly – using posturpedic braces and pillows, and laying

14   upright to take the pressure off of her spine in the lower lumbar, caused her pain to

15   go down to an eight.  (AR 30).  She was taking Elavil, Vicodin, Soma, Roboxin,

16   and Vioxx.  She had gained 46 pounds since the prior December from medication

17   and was coughing up blood because some of the medications were irritating and

18   working against each other.  (AR 31).  She had to wait five or six months for any

19   treatment due to insurance issues.  (AR 31).  She experienced nausea and for the

20   past two months had been vomiting three times a day.  (AR 31-32).  There had

21   been blood in it since she had been taking the new medications she had been

22   given.  (AR 32).  The medication prevented her from being able to concentrate on

23   anything or to drive, and would make her forgetful.  (AR 32).  Because she could

24   not move her arm to wash her hair, her husband washed her hair for her.  (AR 33).

25   She wore a neck brace and a back brace, and "mainly" layed on the couch and

26   watched television.  (AR 33).  She would check the mail and give the dogs water.

27   (AR 33).  She did a "little light" cooking, and her husband helped her with

28   cooking and household chores.  (AR 34).

1    At the Prior Hearing, a vocational expert testified that a person who could

2    not lift more than ten pounds and who could only occasionally use her right upper

3    extremity for manual activities and fine finger motions could not perform any of

4    plaintiff's prior jobs, but could perform other jobs, *e.g.*, "security-related-type

5    positions such as a gate guard or some security guard type of positions."  (AR 39-

6    40).

7    As noted above, on July 16, 2004, the Prior ALJ determined that plaintiff

8    was not disabled, and that she could lift and carry ten pounds frequently and

9    twenty pounds occasionally, could sit, stand, and/or walk for six hours (each) in an

10   eight hour work day, and could perform a full range of light work.  (AR 76).  The

11   Prior ALJ discounted plaintiff's allegations of disabling pain and limitations based

12   upon discrepancies between plaintiff's assertions and the degree of medical

13   treatment (including medications) sought and obtained, the diagnostic tests and

14   findings made on examination, the reports of the treating and examining

15   physicians, and the level of follow-up treatment (including diagnostic testing)

16   ordered by the treating physicians.  (AR 73).  The Prior ALJ noted that it was not

17   unreasonable to infer that a person experiencing the levels of pain and disability

18   alleged by plaintiff would seek medical care on a regular and persistent basis –

19   something plaintiff had not done.  (AR 73).  The Prior ALJ further indicated that

20   the medical reports describing plaintiff's degenerative disc disease, did not

21   corroborate her allegations of debilitating pain, noting that the x-rays confirmed

22   mild findings and that the nerve conduction studies and electromyogram were

23   within normal parameters.  (AR 74).

**B.     Additional Pertinent Facts/Evidence Presented in Connection**
24
**with the Application in Issue**
25

26   At the time plaintiff filed the Application in Issue on October 7, 2005,

27   plaintiff was 41 years old, with a high school education and some college

28   ///

1    education.  (AR 12, 16, 64-66).  Plaintiff asserted that she became disabled on
2    September 1, 2002 due to spinal disc and nerve muscle damage.  (AR 91).

3        Medical records reflect that plaintiff failed to appear for multiple scheduled
4    appointments with her treating providers at High Desert Community Care Center
5    in late 2004 (AR 183) and throughout 2005 (AR 171, 173, 178, 179).

6        An August 2005 x-ray of plaintiff's cervical spine revealed moderate
7    degenerative arthritis and indicated that plaintiff had moderate disc space
8    narrowing and degenerative change at C6-7, lesser spurring at C4 through C6,
9    intact odontoid, normal prevertebral tissues, and facet joint narrowing, especially
10   from C2 through C4.  (AR 216).

11       An October 2005 nerve conduction and EMG study of plaintiff's right upper
12   extremity revealed findings consistent with chronic C5 radiculopathy.  (AR 218).
13   Clinical correlation was recommended.  (AR 218).

14       On November 10, 2005, plaintiff's mother completed an adult function
15   report for plaintiff which reflects the following:  Plaintiff's mother spent a few
16   days per month with plaintiff.  (AR 139).  Plaintiff lived alone in a trailer.  (AR
17   139).  Plaintiff could do the "very basics" but could not do "deep things" such as
18   cleaning, etc. (AR 139).  Plaintiff had a woman that helped her feed her animal
19   and combed her hair when she had to go somewhere.  (AR 140).  Plaintiff did not
20   get much sleep due to the pain.  (AR 140).  Plaintiff prepared her own meals on a
21   daily basis, although plaintiff's mother sometimes froze meals and gave them to
22   plaintiff to cook in her microwave.  (AR 141).  Plaintiff could not cook anything
23   that required strong stirring.  (AR 141).  Plaintiff did "minimal" household chores.
24   (AR 141).  She went outside daily.  (AR 142).  She shopped in stores for food.
25   (AR 142).  She was able to pay bills and count change.  (AR 142).  Her hobbies
26   and interests were watching TV and her dog.  (AR 143).  She spent time with
27   others on the telephone and sometimes would go to plaintiff's mother's house.
28   (AR 143).  Her condition affected her ability to lift, squat, bend, reach, walk,

kneel, climb stairs and use her hands. (AR 144). She could not pay attention for long periods of time as she had Tourettes Syndrome, which was diagnosed when she was 11. (AR 144, 146). She suffered from seizures. (AR 142, 145).

In January 2006, a consulting physician, John S. Woodard, M.D., conducted a neurological examination of plaintiff. (AR 228-30). Dr. Woodard diagnosed plaintiff with degenerative arthritis of the spine. (AR 230). He opined that her spinal arthritis would seem to incapacitate her for sustained, repetitive forward bending or any very heavy lifting. (AR 230). He noted that all of plaintiff's extremities were within normal range with respect to muscular power and coordination, that there was a slight to moderate tightness and tender nodularity of the posterior shoulder muscles bilaterally but no significant diminution in head rotations. (AR 229). In terms of sensory function, Dr. Woodard noted that testing of somatic sensation had revealed only slight subjective diminution in vibratory sensibility over the entire right side of the body of "dubious neurologic significance." (AR 230). As to plaintiff's residual functional capacity, Dr. Woodard opined: (i) in a normal workday, she should be able to sit, stand, or walk for eight hours; (ii) she should be able to lift and carry 35 pounds occasionally and 15 pounds frequently; (iii) she was capable of stooping, crouching, and squatting frequently and bending occasionally; and (iv) she had no incapacity for reaching, grasping, handling, fingering and feeling. (AR 230).

On January 25, 2006, a physician's assistant saw plaintiff, and on February 2, 2006, completed a "Medical Report" which reflects that plaintiff had a "temporary incapacity" from February 2, 2006 to February 2, 2007. (AR 211).

A March 2006 MRI of plaintiff's cervical spine yielded the following conclusion:

> Multilevel uncovertebral spondylosis and degenerative change with
> severe right neural foraminal stenosis at the level of C4-5 from right
> facet hypertrophy and right marginal osteophyte-disc complex. No

1    significant central spinal stenosis is present.  [¶] Grade 1

2    spondylolisthesis of C3 on C4.

3  (AR 214).  The interpreting radiologist indicated that the prior 2002 MRI

4  (presumably the November 2002 MRI) was not available to him for comparison.

5  (AR 214).  As noted below, a medical expert testified that the March 2006 MRI

6  and the prior MRI were approximately the same.  (AR 61-62).

7    On August 14, 2007, plaintiff's treating neurosurgeon assessed plaintiff

8  with "[c]hronic rightsided neck pain with motor and sensory loss to RUE [right

9  upper extremity]."  (AR 241).   The treatment notes reflect recommendations that

10  plaintiff repeat nerve conduction studies and an electromyogram, be referred to a

11  pain clinic for possible injections, and return to the clinic in four weeks.  (AR

12  241).

13    On January 30, 2008, a physician's assistant saw plaintiff, and on February

14  7, 2008, generated a "Medical Report" which reflects that plaintiff had a

15  "temporary incapacity" from February 3, 2008 through February 3, 2009.  (AR

16  251).

17    February 26, 2008 nerve conduction studies and electromyography of

18  plaintiff's right upper extremity did not demonstrate any evidence of cervical

19  radiculopathy or axonal motor neuropathy.  (AR 245).  The medical expert

20  characterized this report as "normal."  (AR 56).

21    At the August 13, 2008 administrative hearing on the Application in Issue,

22  plaintiff testified, in pertinent part:   She was then 44 years old.  (AR 46-47).  Her

23  right arm/hand and hand and her neck ("back, cervical") were her worst problems

24  right then that were keeping her from working.  (AR 47, 48).  She had weakness in

25  her right arm and hand, impacting her ability to grasp and hold objects, and to pull

26  herself up.  (AR 47).  For example, her mother had to blow-dry her hair because

27  plaintiff could not grasp the blow dryer.  (AR 47).  She also suffered from muscle

28  spasms and numbness from the base of her neck/top of her shoulders, all the way

1   down and into her fingers.  (AR 48).  She had pain from the top of her neck down
2   to her lower back and hips.  (AR 48-49).  If she stood too long, she also had pain
3   between her hip and kneecaps on both sides, and her right leg would collapse.
4   (AR 49-50).  She did not have any of the foregoing symptoms on her left side.
5   (AR 51).  She had bone spurs in the top of her neck.  (AR 51).  She had never had
6   surgery on her bone spurs because she hadn't "gotten to the right doctors yet" as
7   her "insurance [was] County, and [she did not] get very much medical attention
8   through them."  (AR 51-52).  The County insurance wanted her to do epidural
9   injections before making a decision on surgery.  (AR 52).  She could not sit very
10  long in one place, and had to move around to release the pressure on her back.
11  (AR 53).  She could not stand or hold a telephone with her right hand, and would
12  have to trade it to her left hand.  (AR 53).  She had dressed herself that day, but
13  her mother had to tie her shoes sometimes as her right hand would not make a
14  knot.  (AR 53).  She had Tourette's Syndrome, which had been diagnosed by a
15  genetics doctor at the City of Hope when was about 12 years old.  (AR 54).  It was
16  not a current problem.  (AR 54).  She had seizures once in a while but was on
17  medication for that, and had been referred for an EKG.  (AR 54).

18       A medical expert testified at the administrative hearing on the Application
19  in Issue, focusing on whether there was any "material change" in findings from
20  July 17, 2004 – the day after the Prior Decision was issued – up through October
21  7, 2005 – the date plaintiff filed the Application in Issue.  (AR 59-60).   The
22  medical expert testified in pertinent part:   There was no material change in
23  findings from July 17, 2004 up through October 7, 2005.  (AR 59-60).  There was
24  no evidence to show objectively that plaintiff's condition had worsened.  (AR 60).
25  The August 14, 2007 neurological consult reflects that plaintiff's reflexes were
26  absolutely normal, that there was a slight weakness in the right upper extremity,
27  and no evidence of nerve root compression, damage, or injury as would be shown
28  by muscle weakness, wasting, or change of reflexes.  (AR 60).  Plaintiff's

14

impairments did not meet a listed impairment.  (AR 60).  The neurologist diagnosed plaintiff with spinal arthritis.  (AR 60).  There was "no question [plaintiff] ha[d] moderate to severe degenerative cervical spondylosis[.]" (AR 60-61).  She had one electromyelogram study that was abnormal, but two that were normal.  (AR 61).  In the face of a normal clinical examination, one could probably not place too much credence on one abnormal study.  (AR 61).  The medical expert concluded that there had been no material change or worsening of plaintiff's condition, telying primarily on the August 14, 2007 neurological consult – which "clearly . . . did not really support any substantial change in her complaints or findings."  (AR 61).  The March 2006 MRI did not indicate a worsening of plaintiff's condition as it was approximately the same and "basically no differen[t]" than the prior MRI as both showed "moderate to severe degenerative change with closing for stenosis of the nerve root passage at C4-5."  (AR 62).

As noted above, on September 18, 2008, the ALJ determined that plaintiff was not disabled, and that she could perform a full range of light work.  (AR 16, 17).  The ALJ determined that plaintiff had failed to carry her burden of demonstrating a material change in circumstances since the Prior Decision was issued, relying on the testimony of the medical expert, Dr. Woodard's report, the August 14, 2007 neurological consult, and the subsequent normal nerve conduction and electromyogram results.  (AR 15-16).  The ALJ summarized plaintiff's testimony and concluded that there was no objective medical evidence which credibly supported her testimony concerning a deterioration or change in her medical condition.  (AR 15).  The ALJ also pointed to medical records documenting numerous "no shows" by plaintiff for medical appointments in 2002 and 2003, noting that it was reasonable to infer that a person whose medical condition was as severe as plaintiff claimed, would not have missed so many appointments.  (AR 15-16).

1   **V.    DISCUSSION**

2         **A.    The ALJ's Assessment of the Absence of Changed Circumstances**

3                **and the Application of the Presumption of Continuing Non-**

4                **Disability**

5       Plaintiff argues that the ALJ's determination that plaintiff failed to rebut the

6   presumption of continuing non-disability which arose from the denial of the Prior

7   Application – a determination which was predicated, at least in part, on the

8   testimony of a medical expert – was erroneous and/or not supported by substantial

9   evidence.  Specifically, plaintiff contends that the ALJ erred in failing to conclude

10  that the following evidence supported a finding of changed circumstances:

11  (1) the objective tests conducted after the Prior Decision – *i.e.*, the August 2005

12  cervical spine x-ray, the October 2005 nerve conduction and EMG study, and the

13  March 2006 MRI of the cervical spine; (2) the August 14, 2007 opinion of

14  plaintiff's treating neurosurgeon; (3) the 2006 and 2008 opinions of "treating

15  health care providers," *i.e.*, physician's assistants; (4) plaintiff's subjective

16  complaints; and (5) the statements of plaintiff's mother.

17       First, the record reflects that the ALJ did consider the new objective tests

18  and properly relied on the medical expert (who expressly referenced the tests in

19  his testimony), in finding no changed circumstances.  As detailed above, the

20  medical expert concluded that the new tests were essentially consistent with the

21  old tests and demonstrated no material change in plaintiff's condition.  Where, as

22  here, the testimony of the medical expert is supported by other evidence in the

23  record and is consistent with it (*e.g.*, Dr. Woodard's report, the August 2007

24  clinical examination of plaintiff's neurosurgeon), such testimony may serve as

25  substantial evidence to support the ALJ's decision.  Morgan v. Commissioner of

26  Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999).  Plaintiff's

27  counsel's lay opinion disagreement with the medical expert's assessment of the

28  objective evidence does not merit a remand or reversal.

16

1   Second, the record reflects that the ALJ properly considered the August

2   2007 report of plaintiff's treating neurosurgeon.  The ALJ expressly considered

3   the August 12, 2007 opinion of the treating neurologist in light of the subsequent

4   results of the objective tests ordered by such physician which, as the medical

5   expert opined, essentially reflected no worsening of plaintiff's condition.  (AR

6   16).  Contrary to plaintiff's suggestion, the ALJ did not reject such opinion.

7   Third, the ALJ did not err or materially err relative to the opinions of the

8   physician assistants, and there is no basis to conclude the reports of such

9   individuals operated to rebut the presumption of continuing non-disability or

10  constituted material evidence to alter the Prior ALJ's conclusion that plaintiff was

11  not disabled.  Physician assistants are not "acceptable medical sources" regarding

12  what a claimant can still do.  See 20 C.F.R. § 416.913(a); Seltz v. Astrue, 299 Fed.

13  Appx. 666, 668 (9th Cir. 2008) (unpublished) (a physician's assistant's opinion,

14  unlike the opinion of a licensed physician, is not "an acceptable medical source"

15  for establishing a medically determinable impairment).[3]  Moreover, the conclusory

16  statements from the physician assistants in issue provide no supporting detail and

17  do not constitute significant probative evidence which the ALJ was required to

18  specifically address in his opinion.  See Howard ex rel. Wolff v. Barnhart, 341

19  F.3d 1006, 1012 (9th Cir. 2003) (ALJ is not required to discuss every piece of

20  evidence in the record) (citations omitted); Thomas v. Barnhart, 278 F.3d 947, 957

21  (9th Cir. 2002) (ALJ may reject unsupported clinical findings or unexplained

22  diagnoses);  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (same);

23  Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984)  (ALJ must provide

24  explanation only when he rejects "significant probative evidence") (citation

25  omitted).  Any error in failing expressly to address such opinions was harmless.

26  Moreover, to the extent plaintiff contends that the opinions of physician assistants

27

28
        [3]The court may cite unpublished Ninth Circuit opinions issued on or after January 1,
    2007.  See U.S. Ct. App. 9th Cir. Rule 36-3(b); Fed. R. App. P. 32.1(a).

1  should be afforded the same weight and credibility of treating physicians, this

2  position is wholly unsupported.

3        Fourth, this Court finds no material error in the ALJ's assessment of

4  plaintiff's credibility and no basis to conclude that her current complaints operate

5  to rebut the presumption of continuing non-disability or constituted material

6  evidence to alter the Prior ALJ's conclusion that plaintiff was not disabled.  The

7  ALJ recognized that plaintiff claimed that her condition had worsened, but

8  discounted such testimony and found that plaintiff had failed to meet her burden to

9  demonstrate changed circumstances in light of the lack of objective medical

10  evidence to support her claims and her unexplained history of missing scheduled

11  medical appointments.  The ALJ could properly consider plaintiff's failure to

12  "seek treatment or to follow a prescribed course of treatment" in assessing

13  credibility.  See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  Although

14  plaintiff fairly notes that the ALJ recited instances of missed appointments during

15  only the previously adjudicated period of time, the record, as noted above, reflects

16  that plaintiff continued to miss multiple appointments during the current period in

17  issue (late 2004, 2005).  Accordingly, any error by the ALJ in reciting only

18  plaintiff's no shows in 2002 and 2003 was harmless.  Moreover, the ALJ properly

19  pointed to the absence of supporting objective evidence for plaintiff's subjective

20  complaints.  See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999)  (ALJ

21  properly discredited plaintiff's testimony where there was no evidence of muscular

22  atrophy or other physical sign of "inactive, totally incapacitated individual").

23  Although an ALJ may not disregard a claimant's testimony solely because it is not

24  substantiated affirmatively by objective medical evidence, the lack of medical

25  evidence is a factor that the ALJ can consider in his credibility assessment.  Burch,

26  400 F.3d at 681.

27        Finally, any error in failing to discuss plaintiff's mother's statements was

28  harmless.  Plaintiff's mother's statements are essentially consistent with plaintiff's

1  own allegations about her subjective limitations.  Because, as discussed above, the

2  ALJ properly rejected plaintiff's credibility, "it follows that the ALJ also gave

3  germane reasons" for rejecting plaintiff's mother's statements.  See Valentine v.

4  Commissioner, Social Security Administration, 574 F.3d 685, 694 (9th Cir. 2009).

5  **B.  ALJ's Reliance on Grids**

6  Plaintiff contends that the ALJ erroneously relied solely on the Grids in

7  determining that plaintiff could engage in a full range of light work activity.  (AR

8  8-9).  This Court disagrees.

9  If, at step four, the claimant meets his burden of establishing an inability to

10  perform past work, the Commissioner must show, at step five, that the claimant

11  can perform some other work that exists in "significant numbers" in the national

12  economy (whether in the region where such individual lives or in several regions

13  of the country), taking into account the claimant's residual functional capacity,

14  age, education, and work experience.  Tackett, 180 F.3d at 1100 (citing 20 C.F.R

15  § 404.1560(b)(3)); 42 U.S.C. § 423(d)(2)(A).  The Commissioner may satisfy this

16  burden, depending upon the circumstances, by the testimony of a vocational expert

17  or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part

18  404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v.

19  Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett).  When a claimant

20  suffers only exertional (strength-related) limitations, the ALJ must consult the

21  Grids.  Lounsburry v. Barnhart, 468 F.3d 1111, 1115 (9th Cir.), as amended

22  (2006).

23  As the Ninth Circuit has explained:

24  The grids are applied at the fifth step of the analysis under [20 C.F.R.

25  § 416.920], and present, in table form, a short-hand method for

26  determining the availability and numbers of suitable jobs for a

27  claimant.  The grids categorize jobs by their physical-exertional

28  requirements, and set forth a table for each category.  A claimant's

1    placement with the appropriate table is determined by applying a

2    matrix of four factors identified by Congress – a claimant's age,

3    education, previous work experience, and physical ability.  For each

4    combination of these factors, they direct a finding of either "disabled"

5    or "not disabled" based on the number of jobs in the national

6    economy in that category of physical-exertional requirements.  If a

7    claimant is found able to work jobs that exist in significant numbers,

8    the claimant is generally considered not disabled.

9    Lounsburry, 468 F.3d at 1114-15 (citations omitted).

10        Here, the ALJ properly determined that plaintiff suffered from only

11   exertional limitations based upon, among other things, Dr. Woodard's report and

12   the objective medical evidence in the record.  The ALJ likewise properly assessed

13   plaintiff's residual functional capacity based on such evidence and, contrary to

14   plaintiff's suggestion, was not required to elicit testimony from the medical expert

15   regarding plaintiff's residual functional capacity.  (Plaintiff's Motion at 9).

16   Plaintiff's suggestion as to what "common sense would dictate" regarding the

17   objective tests is inconsistent with the medical opinions of Drs. Woodard and the

18   medical expert and does not support plaintiff's position that her condition had

19   worsened since the Prior Decision.

20        In short, the ALJ properly referred to and relied upon the Grids at step 5 of

21   the sequential evaluation process.  Plaintiff's suggestion to the contrary is without

22   merit.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**VI.    CONCLUSION**

For the foregoing reasons, the decision of the Commissioner of Social Security is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:    September 29, 2010

_____
                                                        /s/

Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE